1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

OSCAR OLIVAS,

CASE NO. 14cv1434-WQH-BLM

11

Plaintiff,

ORDER

v.

12

BILLY WHITFORD, Port Director of
Calexico West Port of Entry, Customs
and Border Patrol; PETE FLORES,
Director of Field Operations, San
Diego Field Office, Customs and
Border Protection; R. GIL
KERLIKOWSKE, Commissioner of
Customs and Border Protection; JEH
JOHNSON, Secretary of Homeland
Security; JOHN KERRY, Secretary of
State,

13
14
15
16
17
18

Defendants.

19

HAYES, Judge:

20      The matter before the Court is the Petition for Writ of Habeas Corpus pursuant

21  to 28 U.S.C. § 2241 filed by Petitioner Oscar Olivas. (ECF No. 1).

22  **I. Background**

23      On June 12, 2014, Petitioner Oscar Olivas filed a Petition for Writ of Habeas

24  Corpus pursuant to 28 U.S.C. § 2241. (ECF No. 1). The Petition alleges that Petitioner

25  is "a 45-year-old natural-born U.S. citizen who Customs and Border Protection (CBP)

26  officials unlawfully exiled to Mexico almost three years ago." *Id.* at 1-2. Petitioner

27  alleges that he was "born in El Monte in Los Angeles County, California on August 10,

28  1969" and that he "was issued a 'delayed registration of birth' certificate on January 19,

1970, five months after his birth." *Id.* at 6-7.  Petitioner alleges that his "exile began in August 2011 when he attempted to return to the United States from Mexico . . . [and] CBP officials unlawfully refused to allow him to enter the United States." *Id.* at 2. Petitioner alleges that, "[h]aving been detained and removed from the United States against his will, Mr. Olivas effectively remains in custody for purposes of habeas corpus jurisdiction under 28 U.S.C. § 2241." *Id.* at 17.

Petitioner requests that this Court (1) "Grant the Order to Show Cause as requested . . .," (2) "Issue a writ of habeas corpus ordering Defendants to allow Plaintiff to enter the United States without detaining him," (3) "Declare the Plaintiff is a U.S. citizen," (4) "Declare that any order directing or authorizing Plaintiff's removal from the United States was entered in violation of the Due Process Clause of the Fifth Amendment and/or other applicable law and is therefore null and void," and (5) "Enjoin Defendants and their officers, agents, servants, employees, attorneys, and/or successors from prohibiting Plaintiff from entering the United States and/or detaining him at or after such entry . . . ."  (ECF No. 1 at 20-21).

On June 12, 2014, Petitioner filed an "Application for Issuance of Order to Show Cause Pursuant to 28 U.S.C. Section 2234."  (ECF No. 3).

On June 16, 2014, the Court ordered Respondents to show cause why the petition should not be granted.  (ECF No. 5).

On July 8, 2014, Respondents filed a Return to Petition for Writ of Habeas Corpus.  (ECF No. 12).  In the Return to Petition for Writ of Habeas Corpus Respondents allege that "[o]n December 17, 2010, Petitioner's mother, Ms. Olivas-Cervantes, was interviewed by a consular officer at the U.S. Consulate in Ciudad Juarez, Mexico." *Id.* at 2.  "During the interview, Ms. Olivas-Cervantes signed an affidavit stating that Petitioner was not born in Los Angeles, but was born in a clinic in Tijuana, Mexico." *Id.* at 3.  "On or about August 22, 2011, Petitioner applied for admission to the United States at the Calexico Port of Entry, claiming he was a U.S. citizen." *Id.* at 4.  "The CBP officer who was processing Petitioner's application for

admission prepared documentation to commence removal proceedings before an Immigration Judge ("IJ") . . . [t]wo notices to Appear ("NTA") were prepared, and both appeared to have been 'cancelled,' under 8 C.F.R. § 239.2 prior to the commencement of proceedings." *Id.* at 5.

On July 22, 2014, Petitioner filed a Traverse.  (ECF No. 15).[1]

Parties filed supplemental briefing regarding the standard and burden of proof in this case.  On November 2, 2015, the Court issued an Order stating:

> Pursuant to 28 U.S.C. § 2243, Petitioner is entitled to an evidentiary hearing to prove the disputed fact that he was born in El Monte, California and that he is entitled to an order allowing him to enter and remain in the United States.  The Court will hold an evidentiary hearing to "summarily hear and determine" the disputed fact of petitioner's place of birth and citizenship.  28 U.S.C. § 2243.

(ECF No. 126 at 3-4).

The Court held a four-day evidentiary hearing beginning on November 12, 2015. Petitioner testified on his own behalf and presented evidence that included Petitioner's birth registration (Ex. 11), Petitioner's immunization record (Ex. 2), photographs (Ex. 3), and the visa application of Petitioner's mother (Ex. 5).  Petitioner presented the testimony of his mother, Delia Perez; his father, Raul Encinas; his aunt, Hortencia Garcia; his family friend, Josefina Gaona; and his wife, Claudia Hernandez.  Petitioner presented testimony of an expert witness on police interrogations and false confessions, Deborah Davis, PhD.  Petitioner presented the deposition testimony of his aunt, Anastacia Ontiveros; his aunt, Elvira Rodriguez; and the State Department employee who interviewed Petitioner's mother at the U.S. consulate in Ciudad Juarez, Shashenka Esparza.

Respondents presented evidence of Petitioner's grandparents' visa applications (Exs. Y, Z).  Respondents presented the deposition testimony of Shashenka Esparza, Ryan Grizzle, and Kerry Hyre, State Department employees working in the Fraud

---

[1] On December 11, 2014, the Magistrate Judge issued an order limiting discovery to information directly related to Petitioner's habeas claim and denying Petitioner's motion to compel discovery related to Petitioner's Fifth and Fourteenth Amendment claims.  Petitioner's non-habeas claims remain pending.

Prevention Unit at the U.S. consulate in Ciudad Juarez in December 2010.

**II. Findings of Fact**

### A.  Immigration History

Delia Perez ("Perez"), Petitioner's mother, was born in Mexico on January 11, 1947, the youngest of six daughters to Cresencio Olivas and Trinidad Maria Olivas. Perez was raised in and around Mexicali, Mexico.  Cresencio Olivas and Trinidad Maria Olivas are deceased.

In 1963 or 1964 when Perez was sixteen or seventeen years old, she began crossing the border from Mexicali into the United States daily to work as a field hand in Imperial Valley.  Perez testified that she used a false identity and false United States birth certificate to enter the United States through the Calexico Port of Entry.  Perez testified that she understood that she was violating immigration law by entering the United States using a false identity and claiming to be a United States citizen.

Perez testified that she met Raul Encinas, Petitioner's father, in 1963 or 1964 when she was sixteen or seventeen years old.  Petitioner testified that she and Encinas were working in the fields in Imperial Valley when they met and they became romantically involved.  On June 18, 1964, upon discovering Perez lacked proper documentation, U.S. Border Patrol allowed Perez to voluntarily depart the United States.  In 1965, Perez obtained a border crossing card, which allowed her to enter the United States for 48-hour periods.

Perez testified that her parents, Cresencio Olivas and Trinidad Maria Olivas, moved to Los Angeles together in the late 1960s while Perez remained in Mexicali. Hortencia Olivas Garcia, Perez's sister, testified at the evidentiary hearing that her parents came to the United States together and that they never lived apart from each other.  In excerpts of her deposition admitted at the evidentiary hearing, Anastacia Ontiveros, Perez's sister, testified that her parents moved to the United States together.

In a typed Immigrant Visa and Alien Registration application for Cresencio Soto Olivas, Cresencio Olivas indicated that he resided in "Mexicali, Baja California" from

"Nov1943–Nov.1966" and resided in "Los Angeles, California" from Nov1966–May1972." (Ex. Z at 5). In a typed Immigrant Visa and Alien Registration application for Marie Trinidad de Cervantes Olivas, Marie Trinidad Olivas indicated that she resided in "Mexicali, Baja Califor." from "Nov. 1943–Nov.1969" and resided in "Los Angeles, California" from "Nov. 1969–May 1972." (Ex. Y at 24). Both applications were signed, and all the information in them sworn to be true, by Cresencio and Marie Trinidad Olivas, respectively, in Tijuana on November 21, 1972.[2]

**B. Delia Perez**

Perez testified that she moved from Mexicali to live with her parents in the United States "around May or -- in the middle of the year, '68." (ECF No. 144 at 20:12-25). Perez testified that she saw Raul Encinas, Petitioner's father, in Los Angeles in 1968 driving down the street in his car. Perez testified that Encinas saw Perez and stopped. Perez testified that Petitioner was conceived in Encinas's car in Los Angeles. Perez testified that she found out she was pregnant but she did not tell Raul Encinas and did not see Raul Encinas again because she did not know where to find him.

Perez testified she had been looking for work since she moved to the United States, but once she told her parents that she was pregnant, her father did not want her to look for work until after she had given birth.

Perez did not see a doctor while she was pregnant and received no prenatal care. Perez testified that she did not go to a doctor because she "felt fine," and she "would have liked to, but [she] had no money and . . . wasn't working." (ECF No. 161 at 53: 14-20). Perez testified that her father did not want her to go to the doctor because he was afraid that she would be deported.

**C. Other Births in the Olivas Family**

During the time Perez was pregnant with Petitioner, two of Perez's sisters,

---

[2] Cresencio Olivas indicated on his visa application that he was assisted in completing the application, but the portion of the application asking for the identity of the person assisting the applicant was left blank. (Ex. Z at 7). Trinidad de Cervantes Olivas did not indicate on the visa application whether she was assisted in completing the application. (Ex. Y at 26).

Anastacia Ontiveros and Hortencia Garcia, were also pregnant and living in the Los Angeles area.  Perez's sisters testified that they received prenatal care during their pregnancies.  Perez testified that her father did not tell Ontiveros and Garcia not to go to the doctor "[b]ecause they had husbands, and their husbands would take them to the doctor."  (ECF No. 161 at 55:3-7).  Anastacia Ontiveros, testified in her deposition that during Perez's pregnancy, she saw Perez almost daily because they lived nearby.

Several months before Petitioner was born, Hortencia Garcia gave birth to a daughter on April 4, 1969 at the Los Angeles General Hospital.  On cross examination, Garcia testified that she was not pregnant with her daughter at the same time that Perez was pregnant with Petitioner.  Garcia testified,

> Q. And do you recall when Oscar was born?
> A. 8/10/69.
> Q. So wasn't there an overlap of about five months when you were pregnant at the same time with Delia?
> A. No.  Well, Gabriella was born in April.

(ECF No. 146 at 60:12-16).  Anastacia Ontiveros gave birth to a son in November 1969, three months after Petitioner was born.  Ontiveros testified in her deposition that she received prenatal care and gave birth to her son at the Los Angeles General Hospital.  At the time, Ontiveros was not lawfully present in the United States.

**D.  Petitioner's Birth**

Petitioner Oscar Olivas was born on August 10, 1969.  Petitioner's biological parents are Delia Perez and Raul Encinas.  Perez testified that Petitioner was born in her parents' home in Los Angeles, where she was residing.  Perez testified that the address of her parents' home was 2017 East 78th Street.  Perez testified that she did not go to a hospital to give birth because her father told her she would give birth at home.  Perez testified that she began having contractions the previous afternoon at home with her mother and father.  Perez testified that when her contractions began her mother called her sister Hortencia Garcia "to come over and stay with her because my dad was going to work in the morning."  (ECF No. 161 at 58:7-9).  Perez testified,

> Q. After Hortensia came, did anyone else come to the house that night or morning?

A. No.
Q. Until Oscar was born, it was just Hortensia and your mom?
A. Yes.
Q. When you gave birth to Oscar, when Oscar came out, was anyone else in the house besides your mother and Hortensia?
A. No. And the midwife.
Q. Who was the midwife?
A. I didn't previously know that lady.  She was my mom's friend, but I didn't know her.
Q. Had you ever met her before?
A. No.
Q. How is it that the midwife came to the house?
A. Well, I didn't really notice a time, but I suppose it was like at 6:00 or 6:30, something like that –

*Id.* at 59:9-24.  Perez testified that Petitioner was born at 8:30 or 8:40 in the morning on August 10, 1969.  Perez testified that she does not recall the midwife's name and that she never saw the midwife again.

Hortencia Garcia, Perez's sister, testified at the evidentiary hearing that Petitioner was born at 2017 78th Street in Los Angeles.  Garcia testified that at the time of Petitioner's birth, she was living in the Whittier neighborhood of Los Angeles.  Garcia testified that she was at the house when Petitioner was born because her mother had called her come while Perez was in labor.  Garcia testified that she was present when Petitioner was born, along with her mother and a woman who came to help with the birth.  Garcia testified that the woman who helped with the birth left ten or fifteen minutes after Petitioner was born.

Anastacia Ontiveros, Perez's sister, testified in her deposition that she lived on East 78th Street in 1969, less than half a block away from her parents.[3]  Anastacia Ontiveros initially testified in her deposition that she did not find out about Petitioner's birth until the day after he was born when her mother called her.  Anastacia Ontiveros testified later in her deposition:

A. . . . [S]he had the baby in the morning.  I think it was like 8:00, 8:10, something like that, in the morning.
Q. At about 8:10 in the morning?

---

[3] The Court does not make any adverse inference from the fact that Petitioner's aunt, Anastacia Ontiveros, did not appear in person at the evidentiary hearing. Respondent provided no evidence that a subpoena was properly served on Anastacia Ontiveros.

A. Yes, around that time.
Q. Do you know when she went into labor?
A. No, no.
Q. And so was it the day he was born that you found out he had been born?
A. Yes, in the afternoon, in the afternoon.
Q. And who told you?
A. My mom.
Q. In person or on the phone?
A. No, in person.
Q. She came over to your house?
A. Yes.

(Deposition of Anastacia Ontiveros at 41:3-18, November 18, 2014).   Ontiveros testified in her deposition that she visited Oscar the day he was born and her mother and father were present, but Hortencia Garcia was not present because she lived farther away.  Later in the deposition, Anastacia Ontiveros was shown a declaration signed and dated July 17, 2014, in which Anastacia Ontiveros states that she saw Perez when she was pregnant in Los Angeles and visited Petitioner the day after he was born.  Ontiveros testified in her deposition that she had never seen the declaration before.  After reading the declaration, Ontiveros testified in her deposition,

Q. Okay.  Paragraph 6.  "In August 1969, Delia gave birth to Oscar."  It says, "I was not at the house when Oscar was born, but my mother called to tell me the news."
A. Yes.
Q. So she called you on the telephone?
A. Um-hum.
Q. She didn't come to your house?
A. Correct. . . .
Q. And then it says, "The next day, I went to my parents' house to visit Delia and to meet Oscar."
A. Um-hum. Yes.
Q. Is that correct?
A. Yes, yes, correct.

*Id.* at 71:18-72:13.  Ontiveros testified that she did not see the midwife and did not know the midwife's name.  Ontiveros testified in her deposition, "I don't know [the midwife].  I'm not sure if she lived in Tijuana, but she was visiting L.A., I think."  *Id.* at 42:16-18.  Ontiveros testified in her deposition that her mother was acquainted with the midwife and "knew from that lady that she assisted in childbirth in Tijuana."  *Id.* at 42:19-24.

Elvira Olivas Rodriguez, Perez's sister, testified in her deposition that she was

living on East 78th Street at the time of Petitioner's birth and that she met Petitioner when he was seven days old.  Rodriguez acknowledged in her deposition that her visa application indicates that she lived in Mexicali until 1970.  Rodriguez gave birth to a son in a hospital in Los Angeles in 1971.

At the evidentiary hearing, Perez was asked whether she stated in her deposition that Rodriguez did not come to see her at the house in Los Angeles because Rodriguez was in Mexicali; Perez acknowledged that she had said that.  On cross examination, Perez was asked whether Rodriguez was in Mexicali when Petitioner was born and Perez responded, "No."  (ECF No. 146 at 30:18-20).  Anastacia Ontiveros testified in her deposition that Rodriguez was living in Mexicali when Petitioner was born.

Perez testified at the evidentiary hearing that she procured a false declaration from sister, Elvira Olivas Rodriguez, in which Rodriguez stated that she was a friend of Perez in Los Angeles, saw Perez when she was pregnant, and met Petitioner in Los Angeles when he was one week old.  At the evidentiary hearing, Perez testified,

> Q: Since you signed that declaration in Juarez, in trying to protect Oscar's citizenship, have you always made good decisions?
> A: Well, I believe so.
> Q: You mentioned you have a sister named Elvira Olivas?
> A: Yes.
> Q: You have a friend also named Elvira Olivas?
> A: No.
> Q: And, again, you recall being deposed in this case?
> A. Yes.
> Q: Do you recall being asked about a declaration signed by an Elvira Olivas?
> A: Yes. . . . And I'm very sorry, and I'm -- very remorseful, but I did it to protect -- to protect and for my son to be given his citizenship back.
> Q. Well, let's -- let's talk about what you did.  What -- what did you say about your relationship with the Elvira who signed that declaration?
> A. I said she was a friend because when they asked me for witnesses, for people who knew us, sisters or relatives, I went there to the place where my son was born.  And I didn't find anyone, none of the ladies who really liked me, who -- who saw me when I was pregnant, when I gave birth to my son, and I didn't find anyone.  Some of the ladies had passed away, and others had moved away.  And . . . I thought I can say Elvira is a friend so that it will help in the declaration and say that she's one of the friends.
> Q: Why did you think it would help to say she was a friend instead of your sister?
> A: Because . . . they were asking for witnesses who knew us, and they said that would be very useful. . . .
> A: . . . But as far as that -- that statement, I fixed that with an attorney.
> Q: How did -- how do you think that you fixed that?

A: Because I signed the document, and he told me that that had been cleared up, that lie that I told.

(ECF No. 144 at 40:24-42:13).

Josefina Gaona, a friend of Perez and her sisters, testified at the evidentiary hearing that she moved to the United States in 1968 and lived with Anastacia Ontiveros and her husband, Rodolfo, on East 78th Street for a few months. Gaona testified at the evidentiary hearing that while she was living on East 78th Street with Anastacia and Rodolfo Ontiveros, Perez and her parents were living less than half a block away on the other side of the street. Gaona testified that Perez was pregnant at the time. Gaona testified at the evidentiary hearing that she met Petitioner the second day after he was born. In a declaration dated July 12, 2014, Gaona stated that she was living on the same street as Perez when Petitioner was born and that she moved to El Monte, California shortly after Petitioner was born. At the evidentiary hearing and in her deposition, Gaona testified that when Petitioner was born she had already moved from East 78th Street to El Monte.

**E. Perez's Social Security Application**

Perez testified that after Petitioner was born, she began working at factories in Los Angeles. On November 3, 1969, Perez applied for a Social Security number. Perez testified that Rodolfo Ontiveros assisted her in filling out the application for a Social Security number because the form was in English and Rodolfo Ontiveros was the person who always helped Perez fill out paperwork. The address listed on the Social Security number application is 2041 East 78th Street, Los Angeles, California, 90001. Perez testified that the address listed on the application was the address of her sister, Anastacia Ontiveros, and brother-in-law, Rodolfo Ontiveros.

**F. Registration of Petitioner's Birth is Los Angeles**

Perez testified that she did not register Petitioner's birth immediately because her father refused to allow Perez to register Petitioner's birth. Perez testified that her father was afraid Perez would be deported to Mexico. Perez registered Petitioner's birth in Los Angeles, California on January 19, 1970. Perez testified that she was prompted to

register Petitioner's birth in January 1970 because she took him to the doctor for a check up and immunizations but the doctor would not see Petitioner because Perez did not have Petitioner's birth certificate.  Perez testified that after the doctor refused to see Petitioner, her brother-in-law, Rodolfo Ontiveros told her he would take her to get her son registered.  Petitioner testified that Rodolfo Ontiveros knew how to register a birth and spoke English well.  Perez testified that she and Rodolfo Ontiveros went to the courthouse and Rodolfo Ontiveros spoke in English to someone and filled out a piece of paper with the necessary information.

### G. Petitioner's Birth Certificate

The birth certificate states that Petitioner was born at 2030 East 78th Street. Perez testified that the address listed on the birth certificate is not the address of the home Petitioner was born in, or the address of Perez and Petitioner's residence.  Perez testified that 2030 East 78th Street was the address of Anastacia and Rodolfo Ontiveros at the time of Petitioner's birth.  Perez testified that she did not notice that the address was incorrect until recently.  On cross examination, Perez testified,

> Q. Last week do you recall Mr. Vakili, Oscar's attorney, asked you why you told me at your deposition that Oscar was born at 2030 78th Street?
> A. Yes, I remember.
> Q. And you said that you thought there would be consequences with Oscar's birth certificate if you said that he was born somewhere else; is that right?
> A. That's right.
> Q. So you knew that the address on the birth certificate was not where Oscar was born; is that right?
> A. Yes.  I noticed until now with this problem that came up because previously I hadn't looked.
> Q. And did you know that Oscar was not born at 2030 when I took your deposition on October 30, 2014?
> A. Yes, Counsel, and I'm sorry.  I am really sorry.  I did it to protect my son, and I repeat, I thought there would be problems if he had been born at another address, and one does whatever one can for one's children.  I didn't think that it would be such a big problem.

(ECF No. 146 at 29:24-30-17).

Perez signed the birth certificate in two places.  Perez testified that she signed her own name in a second box on the birth certificate, marked "Attendant's Certification" where the physician or midwife is instructed to sign because she did not know the name

of the midwife who helped her deliver and was told that she should sign.  On cross examination, Perez testified that when she went to the registrar to complete Petitioner's birth certificate, the registrar asked her to get the midwife's signature or return to the registrar with someone who could certify that he or she attended Petitioner's birth. Perez testified,

> Q. You didn't get the midwife, Ms. Puga, to come back and sign the birth certificate?
> A. No.  She was a little old lady, and I didn't know her, and I didn't know where to find her to go get her.
> Q. And you didn't get your mother to come back and sign the birth certificate?
> A. No, because my mom hadn't seen that lady either anymore, and then they told me that if I didn't have the name of the midwife that I could sign it.

(ECF No. 146 at 27:7-15).

**H.  Deportation of Delia Perez**

Perez testified that she was deported when Petitioner was a baby, while she was working at a factory.  Perez testified that she does not recall whether she was deported to Tijuana or Mexicali.  Perez testified that she contacted her family when she returned to Mexicali and they helped her obtain an application to obtain a visa that would allow her to reenter the United States.  Perez testified that her sister, Hortencia Garcia, and an attorney in the United States prepared the application for her.  Perez testified that she signed the application but that she did not review the information on the form well before sending it back.  The application states that Perez lived in Mexicali until February 1969 and began living in Los Angeles in February 1969. Perez testified at the evidentiary hearing that the application is incorrect because she came to the United States in approximately May of 1968.  Perez testified that she cannot explain the inconsistency between the dates.

Perez was issued an immigrant visa and immigrated to the United States on April 8, 1972.  Perez testified that she received the visa based on having a child born in the United States.

**I.  Petitioner's Childhood**

1   Petitioner testified that he has always believed he was born in Los Angeles.
2   Petitioner's understanding of where he was born is based upon representations made to
3   him by Perez and other family members.

4   Petitioner's immunization record indicates that the first date he received a
5   vaccination was January 19, 1970.

6   Petitioner admitted several photographs of Petitioner as a baby into evidence.
7   Perez testified that the admitted photographs were taken in Los Angeles when Petitioner
8   was five months to two years old.

9   On November 11, 1974, Perez gave birth to her second son, Alberto Solis, in the
10   United States.  Perez testified that she gave birth to her second son at the hospital in
11   Salinas, California.  Alberto Solis was baptized on January 11, 1975.

12   Petitioner was baptized in California on February 17, 1979.  Anastacia Ontiveros
13   testified in her deposition that Oscar was still a baby at his baptism.

14   Petitioner grew up in Los Angeles, California and Salinas, California with his
15   grandparents and his mother.  At the evidentiary hearing, Petitioner testified that when
16   he was growing up, his mother told him that he had been born on 78th Street in Los
17   Angeles.  Petitioner went to school in California and obtained a driver's license as a
18   teenager.  Petitioner testified that when he turned eighteen he registered for Selective
19   Services.

20   **J. Petitioner's Immigration History**

21   On November 6, 1989, Petitioner filed a petition to permit his first wife, Cristina
22   Partida, to seek an immigrant visa.  At the evidentiary hearing, Petitioner testified that
23   he and his wife resided in Mexicali while the petition was pending and Petitioner
24   crossed the border to work in Calexico, California approximately six times a week using
25   his birth certificate, driver's license, and Social Security card.  On November 6, 1989,
26   Petitioner's petition for his first wife's immigrant visa was approved based on
27   Petitioner's citizenship.  On December 5, 1991, Petitioner's first wife was granted an
28   immigrant visa.

On December 2, 1998, at the Calexico Port of Entry, Petitioner was referred to secondary inspection. Border agents discovered marijuana in the vehicle Petitioner was driving. Petitioner was subsequently charged with and convicted of importation of marijuana. Petitioner was not deported as a result of his conviction. As a condition of probation, Petitioner had to remain in the United States.[4]

### K. Application for Lawful Permanent Residence of Petitioner's Wife

Petitioner married Claudia Hernandez, in 2004. In 2008, Claudia Hernandez applied for lawful permanent residence in the United States. While the application for lawful permanent residence was being processed, Claudia Hernandez had to leave the United States. Claudia Hernandez, Petitioner, and their children moved to Mexicali in the fall of 2010. At the evidentiary hearing, Petitioner testified that he continued to cross the border regularly for work in the United States.

At the evidentiary hearing, Claudia Hernandez testified that in the interview for her application for lawful permanent residence with the U.S. Consulate in Ciudad Juarez, Mexico, she was asked questions about Petitioner's birth certificate, Petitioner's mother, and Petitioner's family. Claudia Hernandez testified at the evidentiary hearing that consular officials told her that they wanted to interview Petitioner's mother and that they would give her another appointment to return with her mother-in-law.

### L. The Juarez Interview

Hernandez received an appointment to return to the U.S. consulate with Petitioner's mother on December 17, 2010 at 9:00 a.m. Delia Perez was living in Salinas, California at the time, and traveled to meet Claudia Hernandez in Mexicali. On December 16, 2010, Delia Perez and Claudia Hernandez traveled to Ciudad Juarez together for the interview. Hernandez testified that Perez tripped and dislocated her shoulder that she had recently had surgery on when they arrived at the hotel. Hernandez

---

[4] Testimony regarding Petitioner's prior drug offense was offered at the evidentiary hearing by Petitioner to show that Petitioner was not deported as a result of his conviction. The Court does not use this information in any way to judge the credibility of Petitioner.

testified that Perez was in significant pain through the night and the following day.

On December 17, 2010, Department of State officials questioned Petitioner's mother at the U.S. consulate in Ciudad Juarez, Mexico.[5]  There is no audio or video record of the December 17, 2010 interview.  Perez testified that she went to Juarez after receiving a letter, either from Claudia Hernandez or from the consulate in Juarez, telling her to come to an appointment and to bring documents including photos of her son when he was younger, immunization and medical records, and school records.

Perez testified that when she arrived at the appointment at the U.S. Consulate she turned her documents in at the window in the waiting room and waited to be called. Perez testified that she was called into a small room with a glass divider.  Perez testified that the woman who interviewed her sat behind the glass partition.  Perez testified that the interview was conducted in Spanish and that she was asked questions about her son, and the circumstances surrounding his birth.  Perez testified that after the questions and answers, the interviewer made statements including, "No.  Your son was born in Mexico," "You better tell the truth because you know what can happen to you and what can happen to your son."  (ECF No. 144 at 33:9-16).  Perez testified that during the interview she felt sad and helpless because she was telling the interviewer the truth but the interviewer did not believe her.  Perez testified that she did not leave the interview "[b]ecause I thought the best thing was for me to wait and clarify to them -- for them

---

[5] At the evidentiary hearing, Perez testified,
Q. Have you ever been to Ciudad Juarez in Mexico?
A. No, never.
Q. Have you ever been to the United States Consulate in Juarez?
A. No.
Q. Do you remember your son applying for a visa for his wife Claudia?
A. Yes.
Q. Okay.  Were you involved in that visa process at all?
A. No. . . .
Q.  Okay.  Let's -- let me ask you again.  Have you ever met Department of State officials from Juarez?
A. No.
Q.  Have you ever signed a statement saying that your son was born anywhere other than Los Angeles?
A. Yes . . . .
Q. Where did you sign that statement?
A. In Juarez. (ECF No. 144 at 23:25-24:25).

to believe me that my son had been born in Los Angeles." *Id.* at 35:10-13.

Perez testified that she signed an affidavit while she was at the interview because "They made me lie. I told them my son had been born in Mexico because previously she had told me, 'If you say that your son was born in Mexico, nothing is going to happen. Your son is not going to lose his papers because he has his registration." *Id.* at 35: 14-23. Perez testified,

> A. So she said to me, "Where was he born?" She said once again.
> Q. What did you say?
> A. And then it just popped into my mind. Then I said, "In Tijuana."
> Q. Why did you say that?
> A. I don't know. It just -- it just came to me.
> Q. Why didn't you leave instead of saying that?
> A. . . . I wanted that to be cleared up. I wanted the truth to be cleared up.

*Id.* at 35:23-36:7.

Perez testified that after she stated that Petitioner had been born in Mexico, the interviewer called another man into the room, the two spoke, and the man handed Perez a document. Perez testified,

> Q. . . . did you sign it?
> A. Yes, with -- with much sadness because I didn't think that they would make me sign a lie that I told.
> Q. What was your emotional state when you signed it, if you know, if you can describe it?
> A. Very sad. Very sad. I was crying, and -- and I did not read that paper.
> Q. Couldn't you have just walked away instead of signing it?
> A. No. No. I wouldn't think of leaving. I thought that if I left, they would detain me anyway.

*Id.* at 37:18- 38:2. Perez testified,

> Q. You testified earlier that the interviewer told you to tell the truth; is that correct?
> A. Yes.
> Q. Did she tell you anything else about your obligation to tell the truth?
> A. Yes. Well, when she told me to tell the truth, I told her, "It's the truth. I'm telling you where my son was born. That's the truth." . . . And she told me, "Do you know that if you lie, you can go to jail?"

*Id.* at 38:12-22. The English translation of the affidavit Perez signed at the U.S. Consulate in Ciudad Juarez on December 17, 2010 ("the Juarez Statement"), states:

- 16 -

I, Delia Olivas Cervantes . . . state with acceptance [sic],[6] freely and without any coercion whatsoever, the following:

That on today's date I came before this Consulate because my son, Oscar Ivan Olivas, requested an IR1 category resident visa to immigrate Claudia Elena Hernandez Alvarez as the spouse of an American citizen. He requested [sic] said petition on June 30, 2008.

For said application, a birth certificate, indicating that Oscar Ivan Olivas was born on August 10, 1969 in Los Angeles, California and that he was registered on January 19, 1970 was submitted.

But the truth of the facts is that my son Oscar Ivan Olivas was NOT born in Los Angeles, CA. He was born in a clinic in Tijuana, Baja California Norte. I don't remember the name of the clinic. I came across illegally from Mexicali, BCN into the United States, together with my son Oscar Ivan, when he was three months old. My brother-in-law, Rodolfo Ontiveros recommended that I register him as if he had been born in the United States.

My brother-in-law went to court with me to register my son as if he had been born in the United States. I did not register my son in Mexico.

My son is unaware of the truth of the facts; he believes he was born in Los Angeles, California.

For which [sic] I am aware that I did not state the truth of the facts before this consular office, which I have been informed is a criminal offense.

(Ex. E-1).[7] The affidavit was signed by Delia Perez and Kerry Hyre, Assistant Head of the Fraud Prevention Office.

In a statement dated May 10, 2012, Perez asserts,

When I was interviewed by an officer on December 17, 2010 at the Offices in Juarez, Chihuahua Mexico, I repeatedly confirmed my son's birth place being Los Angeles, Ca., U.S. Citizen by birth. The officer kept insisting my son was born in Mexico, which I kept denying. I was intimidated and bullied throughout the whole interview. They began to threaten me with immediate incarceration if I did not agree with them. This harassment continued and continued until I signed a statement declaring my son was born in Mexico. They coerced me into signing a false document.

Ex. H at 104. A declaration by Delia Perez, signed and dated July 16, 2014 and filed with the Court on July 22, 2014, Perez states,

---

[6] Where "[sic]"appears, "[sic]" was used in the English translation of the affidavit.

[7] The Juarez statement was admitted into evidence at the evidentiary hearing to impeach the testimony of Perez that Petitioner was born in Los Angeles. The Court does not use this evidence for the truth of the matter asserted.

During the interview at the Consulate in Juarez, a female officer told me that she believed Oscar was born in Mexico.  The female officer threatened that I would lose my United States citizenship and Oscar would not be able to stay in the United States if I did not admit that Oscar was born in Mexico.  She told me that if I admitted that Oscar was born in Mexico, I would be able to keep my citizenship and Oscar would be allowed to stay in the United States with his family.

After I spoke with the female officer, a male officer entered the room. . . .  He pressured me to say that Oscar had been born in Mexico, but I insisted that Oscar had been born in the United States.

I was not given a break to drink water or use the restroom. . . . I did not know how long the officers would keep me in that room if I did not tell them what they wanted to hear.

The officers questioned me for about two hours until I broke down and began crying.  I felt tired and desperate for the questioning and my confinement to end.  I felt the only way to make the officers stop was to tell them what they wanted.

I told one of the male officers that Oscar had been born in Tijuana.  I chose Tijuana because it was the first city in Mexico that came to mind. . . .

The officers presented me with a typed statement and told me to sign it.  As soon as I signed the statement, they took it away from me.

Ex. K at 26-32.

### 1. Fraud Prevention Unit at the U.S. Consulate in Ciudad Juarez

Deposition designations were admitted at the evidentiary hearing for U.S. Consulate employees with the Fraud Prevention Unit, Shashenka Esparza, Ryan Grizzle, and Kerry Hyre.  The consular employees did not specifically remember Delia Perez or her interview with the Fraud Prevention Unit on December 17, 2010.  Shashenka Esparza, a fraud investigation assistant in the immigrant visa section at the U.S. Consulate in Ciudad Juarez in December 2010, testified in her deposition that, as part of her duties in the immigrant visa section, she "reviewed cases with potential fraudulent birth records, and, basically, those records were American, but were U.S. birth records where the people were born with midwives, home births, or delayed birth registrations." (Deposition of Shashenka Esparza at 16:5-17, Dec. 22, 2014).  Esparza testified at her deposition that she does not remember the particular case involving Delia Perez and Petitioner Oscar Olivas because the Fraud Prevention Unit in Ciudad

1  Juarez had many cases concerning suspected fraudulent birth documents.

2  Esparza testified that this particular case was referred to the Fraud Prevention

3  Unit because "the mother is listed as an attendant [at the birth], and it was a home

4  birth." *Id.* at 23:25-24:2.  Esparza testified at her deposition that her interview notes

5  from her interview with Delia Perez indicate that Perez stated that the midwife arrived

6  around 7:00 p.m. and Petitioner's birth was at 8:00 or 9:00 p.m.  Esparza testified at her

7  deposition that she would have asked Delia Perez why the birth certificate indicates that

8  the birth was at 8:45 a.m.

9  Esparza testified at her deposition that when she finishes asking the interviewee

10  questions, "if the story doesn't make sense and the evidence is a little bit awkward" she

11  would speak to the interviewee and tell her that "she needed to be honest . . . that it was

12  time to face the truth" and "if they don't face the truth right now, the truth will haunt

13  them after that, because . . . the government were more strict and strict." *Id.* at 36:14-

14  37:14.  Esparza testified at her deposition that once the interviewee told the truth,

15  Esparza would start typing the affidavit.  The affidavit was printed and given to the

16  mother to review and Esparza would ask the mother if everything in the affidavit is

17  correct.  If the mother agrees with the affidavit, the deputy officer, in this case Kerry

18  Hyre, would be called into the room to sign the affidavit in front of the mother.  The

19  deputy officer asks the interviewee if she was threatened or if she is giving this

20  statement willingly.  If willing, the interviewee will sign the affidavit in front of the

21  interviewer and the deputy fraud manager.

22  Esparza testified at her deposition that there were no incentives or bonuses or

23  rewards for investigators who obtained admissions or confessions.  Esparza testified,

24  Q. . . . did you ever threaten an interviewee with incarceration?
   A. No. I -- personally, I always treat people with respect. . . .

25  Q. And did you ever threaten to take away someone's citizenship?
   A. No. No, not at all. . . .

26  Q. Did you ever promise someone that if they confessed they could keep
   their citizenship

27  A. No.

28  *Id.* at 45:4-46:2.

Ryan Grizzle, the acting fraud prevention manager at the U.S. Consulate in Ciudad Juarez in December 2010 testified at his deposition that he encountered hundreds to a thousand delayed registrations of births accompanying an application for an immigrant visa during his tenure at the U.S. Consulate in Ciudad Juarez.  Grizzle testified at his deposition,

> Q: Will a delayed registration of birth certificate in application for an immigrant visa always trigger questions in the follow-up interview?
> A. No, not necessarily, at least from my experience as a consular officer. . . . If there's other documentation already present, for instance, a passport or additional information within the visa application in the packet, then there would be no need to follow up on it . . . .

(Deposition of Ryan Grizzle at 42:15-43:22, Oct. 22, 2014).  Grizzle testified at his deposition that if there were questions about a birth document when adjudicating an immigrant visa, an interview would be conducted with the applicant.  Grizzle testified at his deposition,

> Q. Could an applicant ever clear up a question as to somebody's birth record?
> A. Possibly if the applicant was the mother or father.
> Q. And only in those circumstances?
> A. No.  Spouses many times had additional supporting documentation....

*Id.* at 45:3-9.  Grizzle testified that a case would be referred to the Fraud Prevention Unit if questions about the birth record were not cleared up by the initial interview with the applicant.  Grizzle testified at the deposition,

> Q. So what would be the next steps if you interviewed the applicant but it wasn't determinative? . . .
> A. The next step would be that we would reschedule a second appointment and we would ask for secondary evidence . . . .
> Q. What would be some examples of secondary evidence that could verify birth in the United States for someone who had had a delayed registration of birth?
> A. They don't verify birth, they verify the validity of the document.  We would ask for things such as pre- and postnatal documentation, hospital records, clinical records, maybe ask for things such as immunization records, school records, siblings' birth certificates, and, again, the same type of pre- or postnatal, things like that, establishing patterns for the family, where they were born and things like that, time frames, time lines. . . . Some of that information could include the petitioner being present or the mother . . . .

*Id.* at 61:25-63:14.  Grizzle testified at his deposition that if the first interview with the applicant was not determinative, the Fraud Prevention Unit would provide examples of

the "type of documentation [that] could help the applicant in trying to answer the questions." *Id.* at 66:5-7. Grizzle testified that the Fraud Prevention Unit could inform the applicant that "one option is that the mother come . . . . But it could only be a request and we could not require them to come." *Id.* at 66:18-67:2.

Grizzle testified at his deposition,

> Q. So while you were in the Fraud Prevention Unit, did a parent who had come in for an interview ever convey to you that his or her child who was the petitioner for an immigrant visa, was not actually a U.S. citizen by virtue of having not been born in the United States?
> A. Yes. On many occasions, more than 50, it could be into the 100s. . . . [T]hose cases required additional work by a U.S. consular officer, meaning an actual officer of the Department of State because that would require a formal declaration by that person, an affidavit which would be a sworn affidavit to a consular officer at that point, because admitting that a person that had documentation that they were a U.S. citizen and is not, that could not simply rest at the investigative level with a local national taking that information, it would require a sworn statement in front of a consular officer at that point. . . . I also remember cases where an investigator would come to me and say, a parent, mother or father has admitted that their son or daughter was not born in the United States, and then by the time I got to the room to conduct a separate interview and to swear them in and go through the affidavit process that they would recant or they would say that was not what they had said . . . .

*Id.* at 93:3-94:4.

Grizzle testified at his deposition,

> Q. So if there was someone living in the United States with what appeared to you to be a fraudulently obtained birth certificate, you wouldn't refer that to the diplomatic secretary office?
> A. That's not normally something that we would refer to the diplomatic security office because we're not making a determination on citizenship at that point. I would say our next step, if there was simply a birth record is that we would notify the American Citizen Services section because we would want to flag information for a possible application for a passport. So if the person then tried to obtain a passport, they would have to answer questions and we would provide that basic information. Again, it may not be germane to the case, the adjudicating officer would have to make that decision, but the information would be logged.

*Id.* at 103:14-104:6. Grizzle testified at his deposition that he and his deputies would not swear a parent in to make a sworn statement "until we were very sure that they understood what they were doing, they understand the information that was being presented to them, that we were comfortable with the process in which the information was gathered, that they understood the implication of it." *Id.* at 110:4-10. Grizzle

testified that "[I]n no way, shape or form do we have any authority to force people to give us information or in no way shape or form would we promise them something in return for information." *Id.* at 140:19-22.  Grizzle testified at his deposition that "If any applicant requested to get water, to use the restroom, to get food, even if that required them leaving the consulate premises, they were granted that.  Also, there was no way for us, since we were separated by a hard line and bullet-proof glass and everything, that we could have stopped them from walking out of any interview at any time." *Id.* at 153:15-21.

Reviewing the case notes from the Fraud Prevention Unit in Petitioner's case, Grizzle testified in his deposition that, "the biggest thing it shows me there is there's some concern of the date of birth versus the date of registration, and also that the mother was the only person listed as the attendant . . . ." *Id.* at 148:9-12.  Grizzle testified that "[i]t would be uncommon to simply have only the mother listed as an attendant.  Normally a birth is going to be with, you know, some sort of medical professional or there's going to be somebody else there to assist the mother with the birth, a family member or something if it's a home birth." *Id.* at 158:21-159:1. Reviewing Petitioner's baptismal record, Grizzle testified that it "appears slightly peculiar to me based off of cultural things, only because it wasn't until 1979 and I believe the petitioner was born in 1969, so almost ten years old.  Culturally, we only see a baptismal happening when the child is young in Mexico." *Id.* at 160:2-7.

Kerry Hyre, the consular officer in Ciudad Juarez who put Delia Perez under oath and signed Perez's sworn statement, testified at her deposition that before taking a sworn statement she asks follow-up and clarifying questions with the interviewee to ensure that what they are saying is voluntary and that the interviewee understands what they are saying in the affidavit before they sign it.  Hyre testified that it was not a unique situation to have a parent confess that their child is not a U.S. citizen but that the child is unaware that they were not born in the United States.  Hyre testified that it was not the policy of the State Department to intimidate someone during their interview and

1   that employees are trained to treat interviewees with respect.  Hyre testified at her

2   deposition that even when the U.S. Consulate has determined someone is not a citizen,

3   it cannot take someone's passport or decide who can enter the United States, only a U.S.

4   law enforcement officer is entitled to make those determinations.

### 2.  Expert Testimony of Doctor Deborah Davis

6       At the evidentiary hearing, Petitioner's expert witness, Dr. Deborah Davis,

7   described commonly used interrogation techniques and how the techniques lead to false

8   confessions.  Dr. Davis testified that innocent people "overestimate . . . the positive

9   outcomes or underestimate the negative outcomes of . . . false confession."  (ECF No.

10  144 at 103:25-104:2).  Dr. Davis testified that one of the leading reasons for false

11  confessions is the person being interrogated is under distress, either physical or

12  emotional, when they enter the interrogation, causing them to discount long-term

13  outcomes in favor of their desire to end the interrogation.  Dr. Davis testified that a

14  second major reason for false confessions is the person being interrogated becomes

15  convinced that their confession will work in their favor more than a denial will.  Dr.

16  Davis testified that law enforcement and government agencies are trained in the "Reid"

17  method of interrogation, "designed . . . to convince the person it will work to their best

18  interest for them to confess."  *Id.* at 108:17-25.  Dr. Davis testified that the third major

19  reason for false confessions is the person being interrogated cannot resist the demands

20  of the authority figure telling them they need to confess.  Dr. Davis testified that

21  implicit threats can be perceived by interrogation subjects as explicit threats; "a person

22  will just remember that 'I was threatened' and may or may not remember the exact

23  words that were used, but they remember their interpretation."  *Id.* at 151:20-22.

24      Dr. Davis testified that upon reviewing the materials in this case, she identified

25  reasons to believe that the interrogating officer, Shashenka Esparza, used the

26  interrogation technique of theme development while interrogating Delia Perez.  Dr.

27  Davis testified that Esparza used a "You did it to offer your son a better life" theme and

28  "she had just made a mistake and that a lot of nice people can make mistakes and that's

understandable" theme. *Id.* at 128:15-129:11.  Dr. Davis testified that Delia Perez began the interrogation in a "less than ideal" physical and emotional condition and could have felt hopeless. *Id.* at 148:22-149:1.

Dr. Davis testified that it is difficult to distinguish between true confessions and false confessions.  Dr. Davis testified,

> [S]tudies of what's in true confessions and what's in false confessions shows that the false confessions have a lot of the same stuff.  They look very similar.  So it's very difficult to tell them apart.  So what interrogation sellers recommend is, you know, it's best if you have some other evidence to help you corroborate it or not and to compare what's in the confession to everything else you know.

*Id.* at 146:18-24.  On cross examination, Dr. Davis testified that "there are other motivations that might make somebody want to give a true confession." *Id.* at 186:18-22.

On cross examination, when asked whether she considered the differences between police interrogations and consular interviews in forming her opinions, Dr. Davis testified that "the physical way that they conduct these [consular] interrogations or . . . the circumstances of the suspect and where they are" differ. *Id.* at 169:22-170:11.  Dr. Davis testified that she understood that in this case there was a glass partition between the interviewer and interviewee and that the Reid method dictates that "it's best not to have something between you." *Id.* at 170:22-171:4.

On cross examination, Dr. Davis testified,

> Q. Do you know whether the State Department is considered to be a law enforcement agency?
> A. . . . I'm not sure what the State Department all consists of.  I don't know but . . . the important thing is what Ms. Perez thought and what she was told.  So what I know is not really –
> Q. Okay.  And so you didn't consider the culture at the U.S. Consulate at all in arriving at conclusions in your report?
> A. No. I considered most -- whatever these officers or whatever they said in their depositions about what went on. . . .

*Id.* at 176:25-277:16.

### M.  After the Juarez Interview

On January 11, 2011, Petitioner applied for a U.S. passport in Los Angeles, California.  In January 2011, Petitioner's application for a U.S. passport was denied

based on child support arrears.

On August 22, 2011, Petitioner applied for admission to the United States at the Calexico, California Port of Entry.  At the evidentiary hearing, Petitioner testified that on August 22, 2011, he was sent to secondary inspection, searched, and asked questions about his birth certificate, license, and Social Security card.  Petitioner testified that the officer read him the statement his mother gave at Ciudad Juarez, handcuffed Petitioner, and sent him to be processed.  Petitioner testified that he was interviewed several times throughout the night and was released approximately sixteen hours after he arrived. Petitioner testified that he explained in each interview that the statement given in Juarez was false and testified that one of the officers interviewing Petitioner called his mother. Petitioner was not allowed to enter the United States when he was released on August 23, 2011.

Veronica Othon, the CBP Officer at the Calexico Port of Entry who helped process Petitioner on August 22, 2011, testified at the evidentiary hearing that she has no independent recollection of what happened at the Calexico Port of Entry with Petitioner, but offered testimony based on the I-213 report she prepared during the event, contained in Petitioner's A-file.  Othon testified that Petitioner's A-file includes the TECS hit, the lookout notice that generally causes an applicant for admission to be referred to secondary inspection, stating, "false claim to USC, subject's mother signs a sworn statement indicating the subject was not born in the US but born in Mexicali, [Baja California Norte], instead."  (ECF No. 147 at 17:11-19:1).

Othon testified that she obtained the information in the report from statements Petitioner made under oath and from statements made by Petitioner's mother when she was contacted by Othon on the evening of August 22, 2011.  The Record of Sworn Statement in Proceedings from August 23, 2011 at the Calexico Port of Entry, admitted into evidence at the evidentiary hearing, contains a transcript of the interview Othon conducted with Petitioner.  The Record of Sworn Statement in Proceedings states,

Q. Where were you born?
A. I believe I was Los Angeles, California. . . .

1
2

> Q. Has your mother ever stated that you were born else where?
> A. Yes, she has claimed that I was born in Mexicali, then in Tijuana, Mexico."

3  (Ex. G at 32).   Othon testified that the I-213 indicates that when she contacted

4  Petitioner's mother, Delia [Perez] "claimed that her son was born in Los Angeles,

5  despite her sworn testimony given at the [American Consulate] admitt[ing] that Olivas,

6  Oscar Ivan was born in Tijuana."  (ECF No. 147 at 25:21-25).  Othon testified that if

7  Delia Perez had told Othon that she had been threatened or coerced or to give

8  information at the American consulate, Othon would have included that information in

9  the report.

10        At the evidentiary hearing, Petitioner testified that when he was released from the

11  Calexico Port of Entry back to Mexico he was given a packet of forms, including a form

12  listing a toll free number that Petitioner was told to call to check on the date of his

13  hearing.   Petitioner testified that when he returned to Mexico he contacted an

14  immigration attorney and called the toll free number once a week for almost two years

15  but never received a court hearing date.  At the evidentiary hearing, Petitioner testified

16  that he went to the border between seven and ten times to request a hearing and during

17  his last visit, a supervising officer threatened to arrest Petitioner for attempting to enter

18  the United States illegally if he presented himself at the border again.

19        On July 24, 2012, Petitioner applied for a certificate of citizenship on form N-

20  600.   United States Citizenship and Immigration Services denied Petitioner's

21  application for a certificate of citizenship on the ground that he had not established that

22  he derived or acquired U.S. citizenship through his mother.  On January 17, 2013,

23  Petitioner applied for a U.S. passport at the U.S. Consulate in Tijuana, Mexico.

24  Petitioner and his mother were interviewed in connection with Petitioner's passport

25  application.   Petitioner's application for a U.S. passport was denied based on the

26  affidavit his mother signed in Ciudad Juarez on December 17, 2010.

27        Petitioner has been refused entry into the United States.  Petitioner testified that

28  the Mexican government does not recognize him as a Mexican citizen and Petitioner has

never seen a Mexican birth certificate for himself.

### N.  Testimony of Petitioner's Father

At the evidentiary hearing, Raul Encinas testified that he first learned that he had a son named Oscar Olivas approximately three years ago.  Encinas testified that he was married in 1967 in Salinas, California.  Encinas testified that he had a daughter in May 1968 and another son in March 1970, both born in California.

Encinas testified that he first moved to the United States in 1963 and lived in Los Angeles from 1968 to 1971.  Encinas testified that his daughter Barbara was born when he moved to Los Angeles with his wife and was baptized in Los Angeles on February 8, 1969.  Encinas testified that he had sex with Delia Perez in Los Angeles in 1968.  Encinas testified that he often visited his parents in Mexicali in the late 1960s.

On cross examination, Encinas testified that he has received disability payments because he was diagnosed with progressive Alzheimer's disease with "occasional confusion and disorientation."  (ECF No. 146 at 68:11-16).  On cross examination, Encinas testified that he was in removal proceedings in 2001.  Encinas testified that his doctor wrote a letter dated November 23, 2001 indicating that Raul Encinas had progressive Alzheimer's disease.  Encinas testified that in his deposition he stated that he was granted a waiver in his removal proceedings and given back his green card.  Raul Encinas testified that his condition has improved and he no longer has trouble remembering things.

## III.  Analysis

Once a petition for writ of habeas corpus is filed in federal court pursuant to 28 U.S.C. § 2241, the court must comply with the procedures set forth in 28 U.S.C. § 2243.  Section 2243 states that

> [a] court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show case why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto . . . . [T]he person to whom the writ or order is directed shall make a return certifying the true cause of detention. . . . The applicant or the person detained may, under oath, deny any of the facts set forth in the return . . . . The court shall summarily hear and determine the facts,

and dispose of the matter as law and justice requires.

28 U.S.C. § 2243.

The Court has previously determined that

Petitioner has asserted a non-frivolous claim of U.S. citizenship and this Court has jurisdiction pursuant to 28 U.S.C. § 2241 over Petitioner's habeas petition challenging his exclusion from the United States. *See Flores-Torres v. Mukasey*, 548 F.3d 708, 712-13 (9th Cir. 2008) (finding that the court had habeas jurisdiction where petitioner challenged his detention in the absence of a final order of removal).

(ECF No. 126 at 3).

The Court determined that Petitioner was entitled to an evidentiary hearing pursuant to 28 U.S.C. § 2243, to prove the disputed fact that he was born in California. Based on the evidence presented at the evidentiary hearing, the Court will "summarily hear and determine" the disputed fact of petitioner's place of birth and citizenship. *See* 28 U.S.C. § 2243.

In his petition for a writ of habeas corpus, Petitioner asserted that he is residing in Mexico and is unable to enter the United States. (ECF No. 1 ¶ 1-2). At the evidentiary hearing, Petitioner bore the burden of establishing, by a preponderance of the evidence, that he is being unlawfully excluded from the United States because he is a citizen of the United States by birth. *See Snook v. Wood*, 89 F.3d 605, 609 (9th Cir. 1996) ("It is the petitioner's burden to prove his custody in violation of the Constitution, laws or treaties of the United States."); *see also Berenyi v. District Director, Immigration and Naturalization Service*, 385 U.S. 630, 670-71 (1967) (finding that when a person outside of the United States seeks a declaration of citizenship, "[h]e is the moving party, affirmatively asking the Government to endow him with all the advantages of citizenship. . . . [I]t has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect.").

Petitioner contends that he carried his burden of establishing, through documentary evidence and testimony of his family and friend that he was born in Los Angeles, California and is a citizen by birth. Respondent contends that neither the

documentary evidence nor the testimony presented at trial supports a finding that Petitioner was born in Los Angeles, California.   Respondents contend that the documentary evidence presented at trial supports an inference that Petitioner was born in Mexico and was brought to the United States by his mother in November 1969 when he was three months old.

### A.  Prior Determinations of Petitioner's Citizenship

Plaintiff initially contends that he has been determined to be a citizen by birth based on his receipt of a birth certificate, a Social Security number, a driver's license, the fact that he was not deported after his criminal conviction, and the fact that his mother and first wife were able to adjust their immigration status based on Petitioner's citizenship.   The Court finds that these prior events were not determinations that Petitioner was a citizen.  Conversely, the United States determined that Petitioner is not a United States citizen by birth when it denied Petitioner's application for a certificate of citizenship in 2012 and denied Petitioner's passport application in 2013.

### B.  Discussion of the Evidence

The Court finds that Petitioner likely honestly believes he was born in the United States.  However, Petitioner's beliefs about the location of his birth are not persuasive because they are based upon statements made to him by persons the Court finds to be not credible.

Petitioner presented testimony of his mother, father, aunts, and family friend stating that he was conceived and born in the United States to support his contention that he is a U.S. citizen by birth.  Petitioner also presented his birth certificate, his childhood immunization records, and photographs of Petitioner as a baby to support his claim that he was born in the United States.

Petitioner's mother, Delia Perez, testified at the evidentiary hearing that she arrived in the United States in the spring of 1968, that Petitioner was conceived in Los Angeles in late 1968, and that her son, Petitioner Oscar Olivas, was born in Los Angeles on August 10, 1969.  At the evidentiary hearing, Perez was evasive in her answers and

repeatedly changed her testimony when she was pressed on a point.  Perez's testimony at the evidentiary hearing was repeatedly impeached by prior inconsistent statements and by documentary evidence.  Perez testified falsely in her deposition about evidence she manufactured from her sister, Elvira Olivas Rodriguez, to support Petitioner's claim of citizenship.  Perez also admitted that she knowingly testified falsely in her deposition that Petitioner was born at the address listed on his birth certificate when she knew that Petitioner had been born at a different address.

Perez made a series of misrepresentations to the United States government outside of these proceedings and in these proceedings in order to obtain immigration benefits for herself and her son.  Perez testified that she used a false identity and false documents to enter the United States on countless occasions in the 1960s and subsequently lied about her past actions on her applications to file a petition for naturalization.  On Perez's first application to file a petition for naturalization, filed in 1984, Perez marked "No" in response to the question on the form asking "Have you ever claimed in writing, or in any other way, to be a United States citizen?"  (Ex. L at 22).  Perez filed a second application to file a petition for naturalization in 1985, and Perez marked "No" in response to the question on the form asking "Have you ever claimed in writing, or in any other way, to be a United States citizen?"  (Ex. L at 14).

Perez's testimony that she arrived in the United States in spring of 1968 is not supported by any of the documentary evidence.  Perez's visa application, completed in 1972, states that she moved from Mexicali to Los Angeles in February 1969.  Perez testified that she cannot explain the inconsistency between the dates.  The earliest documentary evidence showing that Perez was in the United States in 1968 or 1969 is Perez's November 1969 application for a Social Security number.  Furthermore, Perez's testimony at the evidentiary hearing that she moved to the United States in the spring of 1968 is inconsistent with the Juarez Statement, in which Perez indicates that she moved to the United States with Petitioner in November 1969.

The testimony of Petitioner's father, Raul Encinas that he had sex with Delia Perez in Los Angeles in late 1968 has no probative value to establish that Petitioner was born in the United States. Raul Encinas had no knowledge of where Petitioner was born because he did not know he had a son with Delia Perez until three years ago. Encinas testified that he was working and living in Los Angeles during the time that Petitioner was conceived and testified that he went to Mexicali, Mexico often to visit his parents in the late 1960s.

Raul Encinas received a diagnosis of progressive Alzheimer's disease in 2001. On the stand, Encinas was able to recall events from forty years ago with specificity when asked by counsel for Petitioner, but was unable to recall events from less than two years ago when asked by counsel for the Respondent to confirm whether he was asked certain questions and gave certain answers in his 2014 deposition. Encinas's diagnosis of progressive Alzheimer's disease more than fifteen years ago calls into question his ability to accurately recall events from forty years ago.

Past inconsistent statements about the location and circumstances of Petitioner's birth call into question the probative value of the testimony of Petitioner's mother. Perez testified at the hearing that she did not receive prenatal care with Petitioner, that she gave birth at home, and that she did not seek any medical care for Petitioner until he was five months old because she was in the United States unlawfully and feared deportation. However, Petitioner's aunts and family friend testified that they were in Los Angeles unlawfully during this same time period, yet they received prenatal care during all of their pregnancies and they gave birth to their babies in a hospital.[8]

At the evidentiary hearing, Perez testified that a midwife assisted in her delivery. However, Perez did not know the name of the midwife or where the midwife lived.

_____

[8] The consular employees at the Fraud Prevention Unit who interviewed Perez for Petitioner's wife's visa application indicated that the inconsistencies in the patterns and practices of the Olivas family regarding pre- and postnatal care, childbirth, and baptism would have alerted them that Petitioner's California birth registration may be fraudulent.

Perez testified that the midwife was her mother's friend who she had not met before the birth and never saw again.  Perez did not locate the midwife to sign Petitioner's birth registration as a witness, instead signing her own name as the mother and as the witness.  Perez could not explain why she did not have her mother or sister, Hortencia Garcia, sign the birth certificate as the attendant to Petitioner's birth.  Petitioner's aunt, Anastacia Ontiveros testified that she believed the midwife "lived in Tijuana, but she was visiting L.A., I think."  (Ontiveros Depo. 42:16-18).  Ontiveros testified that her mother knew that the midwife "assisted in childbirth in Tijuana."  *Id.* at 42:19-24.  Perez's lack of knowledge about who the midwife was, Perez's failure to have the birth certificate signed by the midwife, and Anastacia Ontiveros's assertions that the woman who assisted with Petitioner's birth lived and worked in Tijuana call into question the veracity of Perez's testimony that Petitioner was born in her parents' home in Los Angeles with the help of a midwife.

The testimony of Perez and Petitioner's aunts, Hortencia Garcia and Anastacia Ontiveros, regarding the circumstances of Petitioner's birth is contradicted by documentary evidence.  Perez and Petitioner's aunts testified that their parents, Petitioner's grandparents, never lived apart from one another and moved to the United States together in the 1960s.  Perez and Petitioner's aunts consistently state that Petitioner's grandmother was present for Petitioner's birth and that his birth occurred at Petitioner's grandparents' home in Los Angeles where Perez was living.  This testimony is contradicted by the visa applications in Petitioner's grandparents' A-files, in which Petitioner's grandmother indicated that she lived in Mexicali until November 1969, three months after Petitioner's birth, at which point she joined her husband in Los Angeles.  *See* Ex. Y at 24.  Petitioner's grandfather's visa application, filed on the same day as the grandmother's in 1972, states that he left Mexicali and moved to Los Angeles in November 1966, three years prior to the date his wife indicated that she moved to Los Angeles.  *See* Ex. Z at 5.  There are no facts to support an inference that Petitioner's

grandparents had a motive to provide false information on their visa applications, completed in 1972. The dates listed on the visa applications of Petitioner's grandparents are inconsistent with the testimony of Petitioner's mother and aunts that their parents immigrated together and never lived apart. Moreover, the testimony of Petitioner's mother and aunts that Petitioner's grandmother was present at Petitioner's birth in Los Angeles in August 1969 is inconsistent with Petitioner's grandmother's visa application indicating that she arrived in Los Angeles in November 1969.

The consistency between the dates on Petitioner's grandmother's visa application indicating that Petitioner's grandmother arrived in the United States in November 1969 and Petitioner's mother's Social Security application, completed in November 1969, lends support to Respondent's position that Petitioner was not born in the United States and came to the United States with his mother and grandmother in November 1969.

In addition to his mother's testimony and his birth registration, the primary evidence Petitioner provides to establish that he was born in the United States is the testimony of his aunt, Hortencia Garcia, and family friend, Josefina Gaona, and the deposition testimony of Petitioner's aunts, Anastacia Ontiveros and Elvira Rodriguez. There are material inconsistencies in the testimony of Petitioner's aunts and family friend. The testimony of Hortencia Garcia relating to the circumstances of Petitioner's birth is inconsistent with the testimony provided by others. Testimony and evidence admitted at the evidentiary hearing indicates that Garcia was pregnant at the same time that Perez was pregnant with Petitioner. On direct examination, Garcia testified that Perez confided in her that she was pregnant at their parents' house in Los Angeles. However, on cross examination, Garcia testified that she was not pregnant while Perez was pregnant with Petitioner. Garcia's testimony that she was not pregnant at the same time as Petitioner calls into question whether Perez was living in Los Angeles during her pregnancy and demonstrates a lack of credibility in Garcia's testimony. Garcia also testified that her sister, Elvira Rodriguez, was living in Los Angeles when Petitioner

was born.  However, both Anastacia Ontiveros and Perez testified in their depositions that Rodriguez was living in Mexicali when Petitioner was born.

The testimony of Josefina Gaona, Petitioner's family friend, lacks credibility because Gaona testified in her deposition that she was living on East 78th Street when Petitioner was born and saw him soon after his birth at his grandparents' house. However, at the evidentiary hearing, Gaona testified that at the time of Petitioner's birth she had already moved to El Monte, California.

The Traverse in the case contains an attached declaration by Elvira Olivas Rodriguez, in which Elvira Rodriguez states that she first met Perez in Los Angeles in 1968 and saw Petitioner in Los Angeles shortly after Petitioner's birth.  After admitting that she procured this statement from her sister, falsely claiming that it was from a friend with the same name, Perez testified, "I'm very sorry, and . . . I'm very remorseful, but I did it to protect -- to protect and for my son to be given his citizenship back." (ECF No. 144 at 41:13-15).[9]  This declaration of Elvira Rodriguez further calls into question the credibility of Rodriguez's deposition testimony.  Furthermore, Rodriguez's deposition testimony that she met Petitioner in Los Angeles seven days after he was born lacks credibility because although she testified at her deposition that she was living on East 78th Street at the time Petitioner was born, her visa application indicates that she was living in Mexicali at the time.  Ontiveros and Perez both testified in their depositions that Rodriguez was living in Mexicali at the time of Petitioner's birth.

The deposition testimony of Anastacia Ontiveros also contained significant

---

[9] When asked by Counsel for Petitioner about why Perez would be dishonest about Petitioner's birth place at the U.S. consulate and why Perez submitted a false declaration from her sister, Elvira Rodriguez, Perez testified,

Q: Okay, Ms. Perez.  That's at least two things now that you've admitted are not true.
A: Yes.

(ECF No. 144 at 42:24-43:5).

inconsistencies bearing on her credibility. Ontiveros testified that she visited Petitioner the day he was born, and then testified that she visited him the day after he was born. Ontiveros testified that when she visited Petitioner the day he was born, her sister, Garcia, was not at the house because she lived farther away. This testimony conflicts with the testimony of Perez and Garcia stating that Garcia assisted with the birth. The inconsistencies in the deposition testimony of Ontiveros raise doubts about Ontiveros's credibility and about the alleged circumstances of Petitioner's birth.

The inconsistencies in the testimony of Petitioner's aunts and family friend cause the Court to conclude that their testimony does not provide credible evidence that Petitioner was born in the United States.

Petitioner's birth certificate, or delayed registration of birth, contains errors that were not adequately explained at the evidentiary hearing. Petitioner's birth certificate is not attested to by anyone other than Petitioner's mother. Perez testified at the evidentiary hearing that the address written on Petitioner's birth certificate in three different places was the incorrect address. Perez and Petitioner's aunts and family friend testified that Petitioner was born at 2017 East 78th Street; however, the address on the birth registration is 2030 East 78th Street.[10] Perez testified at the hearing that she knew the address was incorrect at the time of her deposition and that she did not tell the truth when asked a question about it because she was worried that if she were truthful, it would have negative consequences for her son. Admitting that she lied in her deposition about the address on Petitioner's registration of birth, Perez testified, "I did it to protect my son . . . and one does whatever one can for one's children." (ECF No. 146 at 30:13-16). Perez has done what she can to protect her son's claim of U.S. citizenship by misrepresenting, at times under oath, the circumstances and facts related to Petitioner's birth.

---

[10] Perez testified that Rodolfo Ontiveros filled out the birth certificate for her and put his own address on the form and Perez did not realize the error until recently.

The address on Petitioner's birth certificate is also inconsistent with the address Perez listed on her November 3, 1969 application for a Social Security number. The address listed on the Social Security application is 2041 East 78th Street. Perez testified that Rodolfo Ontiveros helped her complete the Social Security application and the 2041 address was Anastacia and Rodolfo Ontiveros's residence.

Petitioner's birth certificate was issued five months after Petitioner was born, was not signed by a witness to the birth, and contains incorrect information regarding the address where Petitioner was born and lived. None of the documentary evidence presented by Petitioner demonstrates that Petitioner was in the United States until several months after his birth. Petitioner's mother's application for a Social Security number was filed in November 1969 and Petitioner's birth registration and earliest immunization records were completed in January 1970. Additionally, the photographs submitted by Petitioner do not show Petitioner prior to five months of age.

Perez's testimony that Petitioner was born in Los Angeles, California is further impeached by the sworn affidavit signed by Perez at the U.S. consulate in Ciudad Juarez ("the Juarez Statement") stating that Petitioner was born in Tijuana, Mexico.[11] The subsequent statement, declaration, and testimony of Perez alleging that she was

_____

[11] At the evidentiary hearing, the Court admitted the Juarez Statement into evidence for limited purposes of impeachment, not to establish the truth of the matter asserted therein. At the evidentiary hearing, the Court concluded that the statement could not be admitted for the truth of the matter asserted based on the public records or business records exceptions to hearsay.

Respondent contends that the Juarez Statement should be admitted under Federal Rule of Evidence 801(d)(2)(C) as nonhearsay because it is offered against the opposing party and was made by a person whom the party authorized to make a statement on the subject. The Court concludes that the statement is not admissible for the truth of the matter asserted pursuant to Rule 801(d)(2)(C) because the Court does not find that Petitioner authorized his mother to make a statement on the subject of his birth.

Respondent also contends that counsel for Petitioner stipulated to the admissibility of the Juarez Statement for all purposes in the deposition of Ryan Grizzle. *See* Ex. CC at 146:12-15. The Court concludes that given subsequent objections by Petitioner's counsel to the admissibility of the Juarez Statement for the truth of the matter asserted, the stipulation by Petitioner's counsel that the Juarez Statement was admissible does not make the Juarez Statement nonhearsay or subject to a hearsay exception. The Juarez Statement is admissible as impeachment evidence and is not admissible for the truth of the matter it asserts.

coerced to sign the affidavit at the U.S. Consulate through threats and promises are not credible.   The allegations of coercion are refuted by the testimony of consular employees describing the customs and practices of the Fraud Prevention Unit in interviewing and taking sworn statements. Each of the consular employees testified that if any interviewee asked to take a break, use the restroom, or get a drink of water, it was their policy to allow it.  The consular employees testified that the door to the interview room was unlocked at all times.   Perez's allegations of coercion and threats are inconsistent with the deposition testimony of Shashenka Esparza, Ryan Grizzle, and Kerry Hyre, who testified as to the customary method for interviewing individuals suspected of fraud and the practices related to obtaining a sworn statement from the interviewee once fraud was confessed.  Description of these practices included the measures taken to ensure that the statement was voluntary and that interviewees understood the consequences of their statement.  The consular employees credibly testified that it was not the practice of the U.S. Consulate to use threats or promises, and any employee who did use these methods to obtain information faced serious consequences.  Perez's allegations of coercion change over time and do not appear to have been made prior to 2012. The evidence at the hearing did not prove that the Juarez Statement was made under coercive threats or promises.[12]  The Court concludes that the

---

[12] At the evidentiary hearing, Petitioner's expert witness, Dr. Davis, explained that interrogation techniques, used almost universally by law enforcement and government agencies, were used by the consular employees interviewing Delia Perez. Dr. Davis explained the factors that may contribute to an interviewee giving a false confession, but testified that the same factors and interrogation techniques may cause an interviewee to give a truthful confession.

At the evidentiary hearing, counsel for Respondent objected to the expert testimony on the basis that Dr. Davis claimed to be an expert in police interrogation and false confessions and this case does not involve police or a law enforcement agency. Dr. Davis testified that her opinion was relevant regardless of whether an interview was conducted by a law enforcement official because it describes the effect of certain interrogation techniques on an interviewee.  The Court overrules the objection to the testimony of Dr. Davis.  The Court finds that the testimony that common interrogation techniques were used to interview Perez in Ciudad Juarez and that Perez's physical and emotional state may have contributed to her decision to sign the Juarez Statement is not sufficient to support an inference that the statement is a false confession.

Juarez Statement was made voluntarily.

Perez made past misrepresentations to obtain immigration benefits and has admitted that she would do whatever she can to ensure Petitioner is recognized as a U.S. citizen.  Additionally, there are discrepancies between Perez's testimony regarding the circumstances of Petitioner's birth, the Juarez Statement, and the visa application regarding Perez's arrival in the United States. Taking the evidence together, the Court finds that Perez's testimony that her son was born in the United States is not credible.

**IV. Conclusion**

The Court finds that Petitioner likely honestly believes he was born in the United States.  However, Petitioner's beliefs about the location of his birth are not persuasive because they are based upon statements made to him by persons the Court finds to be not credible.

The Court finds the testimony of Petitioner's mother and aunts as to Petitioner's place of birth not credible.  At the evidentiary hearing, Perez gave evasive answers, was repeatedly impeached with the testimony she gave at her deposition, and changed her testimony when she was pressed on a number of points.  Perez has made a series of misrepresentations to the United States government in order to obtain immigration benefits.  The testimony of Petitioner's aunts and family friend contains many material inconsistencies regarding Perez's pregnancy and Petitioner's birth in Los Angeles.

Perez made an inconsistent statement indicating that Petitioner was born in Mexico in a sworn affidavit she made at the U.S. consulate in Ciudad Juarez, Mexico. Although Perez testified that the statement she made in Ciudad Juarez was false, Perez's allegations that she was coerced or threatened to provide a false confession are not persuasive.  Perez's testimony that she arrived in the United States in the spring of 1968 is inconsistent with the statement Perez made at the U.S. consulate in Ciudad Juarez and contradicted by the documentary evidence.

The testimony of Perez and her sisters that Petitioner's grandmother was present

for Petitioner's birth and the birth took place at Petitioner's grandparents' home in Los Angeles is inconsistent with Petitioner's grandmother's visa application indicating that she did not arrive in the United States until November 1969.  The consistency between the visa application indicating that Petitioner's grandmother arrived in the United States in November 1969 and Petitioner's mother's Social Security application submitted in November 1969–the first documentary evidence showing that Perez was present in the United States in 1969–lends support to the Respondent's theory that Petitioner was not born in the United States and came to the United States with his mother and grandmother in November 1969.

Petitioner's birth registration contains information inconsistent with the testimony of Perez and Petitioner's aunts that Petitioner was born at his grandparents' home.  The birth registration is  not signed by any witness to the birth, and was not obtained until January 1970.  Documentary evidence from Petitioner's childhood, including immunization records and photographs, does not prove that Petitioner was in the United States until several months after his birth.

The Court finds that the documentary and testimonial evidence, taken together, does not prove by a preponderance of the evidence that Petitioner was born in Los Angeles.  The Court concludes that Petitioner has not met his burden to prove that he is being unlawfully excluded from the United States because he is a citizen of the United States by birth.

///

///

///

///

IT IS HEREBY ORDERED that the Petition for Writ of Habeas Corpus (ECF No. 1) is denied.

IT IS FURTHER ORDERED that the parties shall file a status report as to how

1  they intend to proceed on the remaining claims within twenty days of the date this

2  Order is filed.

3  DATED:  June 28, 2016

4                                              *William Q. Hayes*
                                              **WILLIAM Q. HAYES**

5                                              United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28